## AFFIDAVIT OF SPECIAL AGENT JAMES KECZKEMETHY

I, James Keczkemethy, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent of the DEA and have been so employed since October 2017. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Prior to my employment with DEA, I was a police officer in Hartford, Connecticut, for more than six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws, including narcotic violations.

2.      During my law enforcement career, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  Many of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure, and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl, cocaine, cocaine base, and others.

3.      During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities. In the course of my training and experience,

I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug trafficking conspiracies. I have participated in all aspects of drug investigations, including Title III wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

## PURPOSE OF AFFIDAVIT

4.    I am submitting this affidavit in support of:

a.    An application for the issuance of a search warrant authorizing the search of 112 University Avenue, Second Floor, Lowell, Massachusetts (hereinafter, the "Target Location"). The Target Location is the second floor of a three-story mixed-use building. The Target Location is accessed by a blue front door that is adjacent to a café on the first floor. A set of stairs after the front door lead to the second floor, which has an apartment door that accesses the Target Location. A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein; and

b.    An application for the issuance of a criminal complaint charging Juan Alexander TEJADA-LARA, a/k/a R.C.,[1] a/k/a "Domi" ("TEJEDA-LARA") with distribution of

---

[1] R.C. is a false identity used by TEJADA-LARA. In order to protect the true R.C., I have only referred to this name by initials. Throughout this affidavit, I refer to uncharged individuals and aliases by initials. But, I know the true names of these individuals.

and possession with intent to distribute 40 grams or more of fentanyl, a Schedule II

controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).

5.      As further discussed below, there is probable cause to believe that TEJADA-LARA

distributed fentanyl to a DEA confidential witness ("CW") on October 22, 2021; and (b) that

evidence of TEJADA-LARA's drug distribution activities can be found at the Target Location. On

January 18, 2022, agents observed TEJADA-LARA take a brief trip into the building of the Target

Location prior to selling fentanyl to the CW.

6.      As a result, I submit that there is probable cause to believe that the Target Location

contains records and other evidence of the following offenses:  possession with intent to distribute

and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of a

communication facility during or in relation to a controlled substances trafficking offense, in

violation of 21 U.S.C. § 843(b); and conspiracy to possess with intent to distribute and to distribute

controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More

specifically, as will be discussed below, I submit that there is probable cause to believe that within

the Target Location there is evidence of the Target Offenses, as described in Attachment B.

7.      Because this affidavit is submitted for the limited purpose of establishing probable

cause that evidence of criminal activity involving the Target Offenses is located at the Target

Location and that TEJADA-LARA distributed and possessed with intent to distribute 40 grams or

more of fentanyl, I have not included each and every fact known to me or other law enforcement

officers involved in this investigation.  Rather, I have included only those facts that I believe are

sufficient to establish probable cause for the issuance of the requested search warrant and

complaint.  All times herein are approximate.

## PROBABLE CAUSE

8.     In October 2021, agents from the DEA and troopers from the Massachusetts State Police ("MSP") initiated an investigation into the drug trafficking activities of the Domi Drug Trafficking Organization ("Domi DTO"). Through intelligence provided by a confidential witness ("CW"),[2] as well as information from law enforcement databases and open-source reporting, agents identified the leader of the Domi DTO as TEJEDA-LARA.

9.     In October 2021, the Lowell Police Department ("LPD") learned that J.G. was selling narcotics in Lowell, Massachusetts.  LPD detectives informed the DEA that J.G. lived with an unidentified male and the two had been arrested for drug trafficking offenses in the Chicago, Illinois area.

10.     Through an internet search, agents learned that J.G. and "R.C." were arrested in October 2020 by the Illinois State Police in possession of two kilograms of cocaine.  As discussed below, further investigation showed that R.C. is an alias used by TEJADA-LARA. The news report of the arrest depicted photographs of both J.G. and TEJADA-LARA.  LPD detectives viewed the photographs from the news report, identified J.G., and identified that TEJADA-LARA was the previously unidentified male who lived with J.G. in Lowell.

11.     Agents showed the CW the photographs of J.G. and TEJADA-LARA from the news report.  The CW immediately recognized TEJADA-LARA as the individual the CW knew as "Domi."  The CW was "150% sure" that the photograph of TEJADA-LARA was Domi.  The CW also identified J.G. as TEJADA-LARA's girlfriend.

---

[2] The CW has a lengthy criminal history, spanning from 2011 through 2019, that includes charges for narcotics trafficking, firearms violations, and motor vehicle violations.  The CW is cooperating with law enforcement for consideration in a pending criminal case involving narcotics trafficking. Based on the corroboration detailed herein, I believe that information received from the CW is reliable.

12.     The Illinois State Police arrest report for R.C. listed R.C.'s alias as TEJEDA-LARA.  The LPD database also identified that TEJADA-LARA has used the alias R.C. The LPD database identified TEJADA-LARA's Dominican Republic Cedula[3] bearing his photograph, which is consistent with his booking photograph from the Illinois State Police arrest.

13.     The LPD database also identified the true R.C. through a Puerto Rican driver's license. The license image of the true R.C. does not match the image of TEJEDA-LARA from his Dominican Cedula or his booking photograph from the Illinois State Police arrest.  I believe that TEJEDA-LARA is using the alias R.C.

<u>October 22, 2021: TEJEDA-LARA sold 207 grams of fentanyl to the CW</u>

14.     On October 22, 2021, the CW, under the direction and supervision of DEA agents, purchased 207 grams of fentanyl from TEJEDA-LARA in Methuen, Massachusetts.

15.     At 1:45 p.m., at the direction of agents, the CW placed several phone calls and text messages to phone number (978) 943-3162, which the CW believed was used by TEJEDA-LARA.  The phone calls and text messages went unanswered.  The CW then identified a second phone number, (646) 239-8731, also believed to be used by TEJEDA-LARA.  The CW's attempts to contact TEJEDA-LARA at this second phone number were unsuccessful.

16.     At 1:57 p.m., the CW received an incoming FaceTime audio call from TEJEDA-LARA.  During the recorded conversation, the CW and TEJEDA-LARA agreed to meet so the CW could purchase 200 grams of fentanyl from TEJEDA-LARA for $2,800.  Several minutes later, the CW received a text message from (978) 943-3162 stating, "113 Boston St Methuen." Agents interpreted that TEJEDA-LARA wanted the CW to meet at that address for the deal. Accordingly, agents established surveillance in the area of 113 Boston Street in Methuen,

---

[3] A Dominican identification card.

Massachusetts.  The conversations between the CW and TEJADA-LARA were in Spanish, which were interpreted by a Spanish-speaking investigator.

17.     At 2:15 p.m., agents observed a black 2018 Honda Accord, bearing Texas temporary registration 27305V7, parked near the intersection of 113 Boston Street and 457-459 Prospect Street in Methuen, Massachusetts.  Agents observed TEJEDA-LARA exit the Honda Accord and walk towards the area of 113 Boston Street and the side door of 457-459 Prospect Street.  These two buildings appear to share a common driveway.

18.     At 2:25 p.m., TEJEDA-LARA returned to the Honda Accord from the area of 113 Boston Street and the side door of 457-459 Prospect Street.  After a few minutes, the Honda Accord traveled up Boston Street and parked near 78 Boston Street.

19.     At 2:30 p.m., the CW received an incoming phone call from TEJEDA-LARA. During the call, TEJEDA-LARA stated that he was in possession of 800 grams of fentanyl ready for distribution and he wanted the CW to be a regular customer.

20.     At 2:30 p.m., agents observed the Honda Accord travel to a liquor store at 441 Prospect Street.  Agents observed TEJEDA-LARA exit the Honda Accord and walk into the liquor store with an unidentified Black male.  Agents observed TEJEDA-LARA and the unidentified Black male conduct a hand-to-hand exchange.  Agents observed TEJEDA-LARA return to the Honda Accord and travel back to the vicinity of 78 Boston Street.

21.     At 2:52 p.m., agents transported the CW to the area of Boston Street.  Prior to the deal, agents searched the CW for contraband with negative results.  Agents equipped the CW with an audio and video recording device and provided the CW with $2,800 of recorded agency funds.  The CW then proceeded on foot towards Boston Street.

22.     At 2:56 p.m., agents observed TEJEDA-LARA travel down Boston Street in the

Honda Accord alone where he met the CW.   Agents observed the CW enter the front passenger seat of the Honda Accord and TEJADA-LARA then parked near the side entrance of 457-459 Prospect Street.  In the vehicle, according to the CW, the CW provided TEJADA-LARA with the $2,800 of recorded agency funds.  TEJADA-LARA informed the CW that he had to retrieve the drugs.  Moments later, agents observed TEJEDA-LARA exit the vehicle and walk towards the area of the side entrance of 457-459 Prospect Street.

23.     Approximately two minutes later, agents observed TEJEDA-LARA exit the side door of 457-459 Prospect Street carrying a small plastic bag.  TEJEDA-LARA entered the Honda Accord and drove up Boston Street before pulling to the side of the road.  In the vehicle, according to the CW, TEJEDA-LARA provided the CW with 20 compressed cylinders of a white powdery substance inside a plastic bread bag.  Each cylinder contained approximately 10 grams of suspected fentanyl for a total of 200 grams.  The CW took a plastic bag containing the 20 cylinders out of the bread bag and left the bread and plastic bag in the vehicle.  After the deal, agents observed the CW exit the vehicle and walk down Boston Street.  TEJEDA-LARA continued driving up Boston Street and parked in the vicinity of 78 Boston Street.  Agents then terminated surveillance of TEJADA-LARA.

24.     Agents followed the CW to a pre-determined meeting location, where the CW provided agents with the fentanyl purchased from TEJADA-LARA. The CW also provided agents the recording device. Thereafter, agents again search the CW for contraband with negative results. The drugs were transported to the DEA Northeast Regional Laboratory for analysis, which confirmed the substance was 207 grams of fentanyl.

<u>Seizure of fentanyl from a motel room used by TEJADA-LARA</u>

25.     On numerous occasions in November 2021, law enforcement officers observed TEJADA-LARA outside the Motel 6 in Tewksbury. The Court previously granted authorization to use a GPS tracking device on TEJADA-LARA's Honda Accord. *See* 21-mj-2555-JGD. The GPS tracking device on TEJADA-LARA's Honda Accord also showed his vehicle at the Motel 6 on a regular basis throughout November and December 2021.

26.     On December 16, 2021, agents executed search warrants on two motel rooms used by TEJADA-LARA. *See* 21-5571-5572-JGD. As detailed in the affidavit in support of those search warrants, agents observed TEJADA-LARA enter both motel rooms. In one of the rooms, agents seized approximately 350 grams of fentanyl compressed into cylinders, similar to the cylinders that TEJADA-LARA sold to the CW on October 22, 2021. Agents also photographed identification documents of TEJADA-LARA's co-conspirator M.W. in the motel room.

<u>January 18, 2022: TEJADA-LARA stopped into the building of the Target Location prior to selling the CW 100 grams of suspected fentanyl</u>

27.     On January 18, 2022, the CW, under the direction and supervision of DEA agents, purchased approximately 100 grams of suspected fentanyl from TEJEDA-LARA in Lowell, Massachusetts.

28.     At 12:17 p.m., at the direction of agents, the CW placed phone calls to phone numbers (321) 945-0007 and (978) 590-4911, which the CW believed was used by TEJEDA-LARA.  The phone calls went unanswered.

29.     At 12:53 p.m., the CW received an incoming call from TEJEDA-LARA, who was using (978) 590-4911.  This call was recorded.  During the conversation, the CW asked TEJADA-LARA for "10," which the CW interpreted to mean 10 "fingers," or 100 grams of fentanyl. TEJADA-LARA agreed to supply the CW with "10," but was waiting for "the guy" with the

"irons," to "press that first." The CW interpreted that TEJADA-LARA was waiting for a co-conspirator who had a press that could compress fentanyl into "fingers." The CW informed TEJADA-LARA to hurry because the CW did not want to wait.  TEJADA-LARA informed the CW that the deal would happen in Lowell. At 12:57 p.m., TEJADA-LARA sent a text message to the CW that stated, "356 wersford," Agents interpreted that text to mean that the deal would happen at 356 Westford Street in Lowell.

30.     After the meeting location was established, agents transported the CW to the area of 356 Westford Street in Lowell.  Prior to the deal, agents searched the CW for contraband with negative results.  Agents equipped the CW with an audio and video recording device.  This amount was consistent with the price of fentanyl charged by TEJADA-LARA in the October 22, 2021 deal.

31.     Prior to meeting with the CW and in anticipation of the controlled purchase, starting around 10:25 a.m., investigators were surveilling TEJADA-LARA in the Honda Accord with physical and electronic surveillance using the GPS tracking device. At 10:40 a.m., TEJADA-LARA parked in the area of the Target Location and entered the building of the Target Location. Two minutes later, TEJADA-LARA exited and traveled throughout the Merrimack Valley area of Massachusetts. Investigators also observed TEJADA-LARA using his telephone during the 12:53 p.m. call with the CW discussed above. Following the call with the CW, at 1:35 p.m., investigators surveilled TEJADA-LARA enter the building of the Target Location. One minute later, TEJADA-LARA exited the building and drove to the area of 532 Westford Street in Lowell.

32.     At 1:54 p.m., investigators observed TEJADA-LARA enter the front door of 532 Westford Street. As the undercover agent and the CW were approaching the area of 356 Westford Street, the CW placed a recorded phone call to TEJADA-LARA.  TEJADA-LARA informed the

CW that he was parked outside of 532 Westford Street.  Shortly thereafter, the CW and an agent arrived outside 532 Westford Street. The agent then provided the CW with $1,400 of recorded agency funds for the controlled purchase.  The CW exited the agent's vehicle and entered the front passenger seat of TEJADA-LARA's vehicle. At that time, the CW was the only occupant in TEJADA-LARA's vehicle. At 1:59 p.m., TEJADA-LARA exited 532 Westford Street and entered the driver's seat of his vehicle. TEJADA-LARA then drove the vehicle around the block and returned to 532 Westford Street. During the drive, TEJADA-LARA reached into the backseat and then provided the CW with a bag of tan powdery substance, suspected to be fentanyl. The CW placed the $1,400 of recorded agency funds in the cup holder.  TEJADA-LARA informed the CW that he provided "130" and that the CW will owe TEJADA-LARA for the extra three "fingers." The CW inquired with TEJADA-LARA why the fentanyl was not pressed into cylinders. TEJADA-LARA explained that he left earlier with the "work" in that condition and that he was working and going to Nashua. I believe that TEJADA-LARA informed the CW that he left his stash location with the drugs in powder form, rather than pressed into cylinders. I believe that TEJADA-LARA did not wait for his co-conspirator to arrive with the press due to the CW's rush.  I further believe that TEJADA-LARA was meeting with various drug customers in Nashua, New Hampshire to re-distribute drugs.

33.     Following the deal, the CW left TEJADA-LARA's vehicle and re-entered the agent's vehicle. There, the CW provided the agent with the bag of suspected fentanyl purchased from TEJADA-LARA and the recording device. Thereafter, agents again search the CW for contraband with negative results.  The tan powdery substance is consistent with the fentanyl previously purchased from TEJADA-LARA and I believe the substance contains fentanyl. The suspected fentanyl will be transported to the DEA northeast regional laboratory for analysis.

<u>TEJADA-LARA's connection to the Target Location</u>

34.     Based on the controlled purchase on January 18, 2022, agents conducted further investigation into 532 Westford Street and 112 University Avenue in Lowell. TEJADA-LARA and his telephone numbers have no apparent connection to 532 Westford Street. Further, based on the fact that TEJADA-LARA reached into the backseat of the vehicle prior to providing the suspected fentanyl to the CW on January 18, 2022, I do not believe that 532 Westford Street is his current stash location. Upon a review of the GPS device attached to TEJADA-LARA's Honda Accord, between December 1, 2021, and January 19, 2022, the Honda Accord was parked in the area of the Target Location on 28 occasions. Further, the Honda Accord was parked overnight outside the Target Location from December 16-23, 2021 (the days following the search at the Motel 6), and December 25, 2021. During the same time period, the GPS device showed that the Honda Accord had stopped outside 532 Westford Street approximately 16 times, but never stayed overnight and most stops were only a few minutes.

35.     On January 19, 2022, investigators went to the building of the Target Location and met with a tenant manager. The manager provided investigators with the leases for the apartments on the second and third floors. As stated previously, the first floor is a café. The third-floor apartment is leased by four university students. The Target Location, on the second floor, is leased by a male and female. The telephone number listed on the lease had two telephone contacts on August 27, 2021 with a telephone number used by TEJADA-LARA, (978) 943-3162 (the "3162 Phone"). TEJADA-LARA used the 3162 Phone to facilitate the controlled purchase on October 22, 2021.

36.     The manger also reported an abnormal amount of foot traffic coming and going from the Target Location. The male lessee provided a Puerto Rican driver's license bearing the

image of a male and the name G.S.M. Upon a query of the Puerto Rican driver's license number, the driver's license number belongs to a female. I believe that the Puerto Rican driver's license is fraudulent.

37.     Upon further investigation of G.S.M., investigators identified several aliases: F.S.M. and A.B.L. The photographs from the Registry of Motor Vehicles for F.S.M. and A.B.L. resemble the Puerto Rican driver's license image for G.S.M.  Hereinafter, I will refer to this individual as F.S.M.  F.S.M. was arrested in 2016 after illegal re-entry into the United States.  The trooper who arrested F.S.M. in 2016 noticed that he had scarred fingertips, which I believe were intentionally scarred to avoid law enforcement detection.  F.S.M. has several warrants in Massachusetts under the name A.B.L. for identity fraud and drug trafficking.  He was most recently charged with drug trafficking in 2011 and a default warrant was issued for his arrest in 2014.  I believe that TEJADA-LARA is supplied by F.S.M., who has illegally re-entered the United States, and the Target Location is a drug stash location.

**Drug Traffickers' Use of Residences and Cell Phones Generally**

38.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally

a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

39.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

40.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

41.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers,

cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

42.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

43.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

44.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating

14

communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

45.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can often be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

46.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

47.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded

to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

48.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the Target Location. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

      a.   controlled substances;

      b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and

16

mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

49.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in mobile phones, computer hardware, computer software or storage media ("computer equipment"), to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer equipment be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.      The volume of evidence ─ storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements ─ analyzing computer equipment for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

50.      The premises may contain computer equipment whose use in the crimes or storage

19

of the things described in this warrant is impractical to determine at the scene.   Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge.   In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant.   If the things described in

Attachment B are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site in order to determine their true

use or contents, regardless of how the contents or ownership appear or are described by people at

the scene of the search.

51.     The law enforcement agents will endeavor to search and seize only the computer

equipment which, upon reasonable inspection and/or investigation conducted during the execution

of the search, reasonably appear to contain the evidence in Attachment B because they are

associated with (that is used by or belong to) TEJADA-LARA or his co-conspirator(s).   If

however, the law enforcement agents cannot make a determination as to use or ownership

regarding any particular device, the law enforcement agents will seize and search that device

pursuant to the probable cause established herein.

52.     Based on all of the information I have obtained during the course of this

investigation, and for the reasons more specifically set forth herein, I believe that TEJADA-LARA

has engaged in the Target Offenses.   I believe that evidence of the Target Offenses will be found

at the Target Location and on certain cellular telephones seized therefrom.

## CONCLUSION

53.     Based on the information set forth above, I believe probable cause exists to

conclude that TEJADA-LARA has committed the Target Offenses and that evidence of the Target

Offenses, as set forth in Attachment B will be found inside the Target Location set forth in

Attachment A. Further, I submit there is probable cause to believe that on or about October 22, 2021, TEJADA-LARA distributed and possessed with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).

54.     Because the search warrant, arrest warrant, complaint, accompanying affidavit, and applications in support thereof reveal an ongoing investigation, it is further requested that the warrants, complaint, accompanying affidavit, and application be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrants and complaint in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents, Task Force Officers, and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government agents and contract personnel acting under the supervision of such investigative law enforcement officers, as necessary to effectuate the warrants.

55.     I, James Keczkemethy, having signed this affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

James Keczkemethy
Special Agent
Drug Enforcement Administration

Attested and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 on January 25, 2022.

Hon. Judith G. Dein
United States Magistrate Judge
District of Massachusetts

## ATTACHMENT A

### (Target Location to be searched)

112 University Avenue, Second Floor, Lowell, Massachusetts is the second floor of a three-story mixed-use building. The Target Location is accessed by a blue front door that is adjacent to a café on the first floor. A set of stairs after the front door lead to the second floor, which has an apartment door that accesses the Target Location. Photographs of the building of the Target Location and the second-floor apartment door are attached.

 

**ATTACHMENT B**

**(Items to be seized)**

All records, from October 2020 to present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1. Controlled substances, including fentanyl;

2. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

6. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location. Such identification

23

evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.     For any computer hardware, computer software, mobile phones, or storage media that might contain things otherwise called for by this warrant ("the computer equipment"), including:

        a.     evidence of who used, owned, or controlled the computer equipment;

        b.     evidence of the attachment of other computer hardware or storage media;

        c.     evidence of counter-forensic programs and associated data that are designed to eliminate data;

        d.     evidence of when the computer equipment was used;

        e.     passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

        f.     records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

        g.     records and tangible objects relating to the ownership, occupancy, or use of the Target Location to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

        h.     Off-site searching of computer equipment shall be limited to searching for the items described in Attachment B.

**DEFINITIONS**

For the purpose of this warrant:

     A.     "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

24

B.  "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.  "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.  "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.  "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.  "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain

contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes